UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTIAN BROWN,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS MOCKLER and JOSE NEVAREZ,<br><br>Defendants. | No. 24 CV 2170<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Defendants Thomas Mockler and Jose Nevarez investigated a homicide as members of the South Suburban Major Crimes Task Force. The investigation obtained video footage of plaintiff Christian Brown and his uncle (the victim's husband) entering the victim's home the morning after her murder. A few days after the murder and after one task force member revealed his and other members' presence in front of Brown's home, members of the task force arrested plaintiff without a warrant while he stood inside his residence. They then transported him to the police department, where he was detained for over 36 hours before being released without charges. Brown brought Fourth Amendment claims against several officers and the Village of South Holland. The only claims remaining in the case are for unconstitutional entry and unlawful seizure against defendant Mockler and unlawful seizure and unlawful detention against defendant Nevarez. Defendants move for summary judgment. For the reasons discussed below, the motion is granted in part, denied in part.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether summary judgment should be granted, I view all the facts and draw reasonable inferences in favor of the non-moving party. *See Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1141 (7th Cir. 2023). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). I may consider materials that are in the record even if not cited by the parties. Fed. R. Civ. P. 56(c)(3).

## II. Local Rule 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*. 919 F.3d 405, 415 (7th Cir. 2019). The moving party must file a supporting memorandum of law and statement of facts demonstrating that it is entitled to judgment as a matter of law. *See Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a). The non-moving party must file a response to that statement and may provide a separate statement of additional facts. N.D. Ill. Local R. 56.1(b)(2)–(3).

Both the initial statements of facts and statements of additional facts must consist of concise numbered paragraphs, supported by citations to specific pages in

the evidentiary record. *See* N.D. Ill. Local R. 56.1(a), (b)(3). The non-moving party must cite specific, admissible evidence to dispute an asserted fact and concisely explain how the cited material controverts the asserted fact. N.D. Ill. Local R. 56.1(b)(3).

Defendants argue that certain of Brown's responses to their statement of facts and certain of Brown's additional statements of facts failed to comply with Rule 56. [145] at 6–10.[1] True, certain of plaintiff's responses do not respond directly to the statements they seek to controvert. *See, e.g.*, [131] ¶¶ 25, 45, 47, 55, 77. Further, I agree that certain of plaintiff's additional statements of facts are not supported by the cited evidence (or, at the very least, are not as definitive as the statements seem to suggest). *See, e.g.*, [141] ¶¶ 1, 3, 17. Although I would be within my discretion to strike plaintiff's assertions, I consider those facts to the extent that they are properly supported by the record.

## III. Facts

### A. The Homicide

On June 22, 2023, Lone Williams did not show up for work. [131] ¶ 15. That same morning, her husband, Joseph Wingard, left their residence (called the

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page and line numbers. Citations to video recordings use the minutes and seconds according to the digital file uploaded to the docket. The facts are largely taken from the parties' responses to their adversary's Local Rule 56.1 statement of facts, [131] and [141], where both the asserted fact and the opposing party's response are set forth in one document. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

"Woodlawn Residence" by the parties) at 8:00 a.m. in Lone's Kia Sorrento. [131] ¶ 17. He picked up his nephew, plaintiff Christian Brown, from plaintiff's home (the "Throop Residence"), and the two returned to the Woodlawn Residence. [131] ¶ 18.

Just before Wingard and Brown arrived, Lone's son left the Woodlawn Residence. [131] ¶¶ 19–20. Wingard and Brown entered the house. [131] ¶ 21. Wingard gifted plaintiff a Buick, which plaintiff used to depart from the Woodlawn Residence at the same time that Wingard departed the residence in Lone's Kia Telluride. [131] ¶¶ 23–24. The two ultimately went their separate ways in the afternoon. [131] ¶¶ 28–30.

At 10:11 p.m., Lone's son returned to the Woodlawn Residence. [131] ¶ 34. He left ten minutes later, before returning home with his girlfriend at 10:53 p.m. [131] ¶ 35. Soon after, he discovered a bullet hole in a portrait, prompting him to search the house. [131] ¶ 36. Lone's son forced open her locked bedroom, where he discovered Lone on her bed, deceased. [131] ¶ 37. There was a noticeable smell in the bedroom, the TV had been left on, a window was open, and a candle was burning. [131] ¶ 38. Around 11:36 p.m., Lone's son and his girlfriend called 911. [131] ¶ 39.

South Holland police officers arrived at the scene and requested assistance from the South Suburban Major Crimes Task Force in investigating the apparent homicide. [131] ¶ 40. Lone's son identified plaintiff as one of Wingard's closest associates and disclosed that Wingard owned a handgun. [131] ¶¶ 41–42.

The following day, on June 23, officers obtained search warrants for Lone's cars and located two boxes of ammunition. [131] ¶ 43. They did not find a handgun. [131] ¶ 43. The medical examiner estimated that Lone was killed on June 21. [131] ¶ 44.

### B. The Arrest

Defendant Jose Nevarez was the Assistant Commander of the Task Force and the commander of the investigation. [131] ¶ 3. During the investigation, about 12 to 15 detectives, including defendant Thomas Mockler, reported to Nevarez about its progress. [131] ¶ 8. On June 25, Nevarez (at least in part) led a briefing session for the task force. [131] ¶ 48. The task force planned to conduct covert surveillance at the Throop Residence, where plaintiff was suspected of being. [131] ¶ 48. The parties dispute whether the task force planned to place plaintiff into custody or whether they intended only to talk to Brown. [131] ¶ 49.

The following events were captured on body-worn cameras. While surveilling the Throop Residence, one of the detectives seized a man he observed approaching the home, mistakenly believing that he was plaintiff. [131] ¶ 52. Detectives then learned that the man was the boyfriend of plaintiff's sister. [131] ¶ 53. The arrest revealed the task force's presence, thereby ending the covert surveillance. [131] ¶ 54. With their cover blown, a detective knocked on the front door of the Throop Residence. [131] ¶ 56.

Plaintiff's sister answered the door and gave detectives permission to enter before her mother quickly revoked consent. [131] ¶ 57. Plaintiff's mother agreed to bring Brown to the front door, where he arrived shortly after. [131] ¶ 58. Plaintiff

declined to step outside to speak to the detectives, so detective Justin Bultema stepped inside, seized plaintiff, and removed him from the residence. [131] ¶ 59. Shortly before Bultema entered the residence, another officer can be heard directing Bultema to grab Brown. [116-6] at 3:45–47; [116-5] at 10:20–23.

The parties agree that defendant Mockler assisted in the arrest and handcuffed plaintiff outside the home but dispute whether Mockler ever entered the residence. [131] ¶¶ 60–61. The body-cam footage depicts Mockler walking up the steps to the front door and stepping onto the threshold. [116-5] at 10:23–26. Plaintiff attaches screenshots from the footage depicting what he alleges to be Mockler reaching into the residence and grabbing Brown's forearm. [141] ¶ 10. Defendant Nevarez was not present for the arrest and did not instruct anyone to enter the residence. [131] ¶ 62.

About an hour after the arrest, at 10:48 a.m., two detectives conducted an interview of plaintiff at the police station. [131] ¶ 64. He declined to consent to a search of his phone. [116-7] at 120:15–17. At approximately 12:19 p.m., officers obtained a search warrant for plaintiff's phone. [131] ¶ 65. The search warrant was based on the same information detailed above. *See* [116-16]. At approximately 7:14 p.m., detectives conducted a second interview of plaintiff. [131] ¶ 66.

The parties dispute at what point defendant Nevarez made the decision to continue detaining plaintiff for further questioning. Nevarez testified that he decided not to release Brown after the initial interview and that he could not remember whether Brown said anything during the initial interview that implicated him in a

crime. [116-12] at 30:12–31:12. Video footage depicting Brown's first interview confirms that Brown told the detectives that he did not enter the Woodlawn Residence and only went into the garage to get the Buick. [111-12] at 47:28–49:03. Ultimately, Brown was not released on June 25.

The next day, the extraction and examination from plaintiff's cell phone was completed. [131] ¶ 68.[2] Plaintiff's "Notes" app contained an entry saying, "Heard my uncle say his last goodbyes" and "Sitting in the house with dead bodies." [131] ¶ 69. The phone also contained web searches related to murders in South Holland around the relevant time. [131] ¶ 70. After the extraction was complete, detectives interviewed plaintiff for the third time. [131] ¶ 71. Nevarez decided that Brown would not be released at 11:56 a.m., after this third interview. [131] ¶ 74. Plaintiff was instead released that evening without charges at approximately 10:16 p.m., after over 36 hours in custody. [131] ¶¶ 75–76. In December 2023, the grand jury returned an indictment against Wingard for the first-degree murder of Lone. [131] ¶ 78.

Plaintiff filed his initial complaint against the Village of South Holland and one detective in March 2024. His second amended complaint (filed in April 2025) brought claims against the Village and several law enforcement officers for

[2] Plaintiff objects to defendants' facts related to the cell phone extraction on the grounds that they are based on expert testimony that was not properly disclosed. [133] at 3–4. But the Seventh Circuit has never held that testimony about extracting data from a cell phone is expert testimony. *See United States v. Julius*, 14 F.4th 752, 755 (7th Cir. 2021). Rule 701 allows testimony based on the expertise a lay witness acquires on the job. *United States v. Montijo-Maysonet*, 974 F.3d 34, 48 (1st Cir. 2020). Here, the witness has acquired significant experience in extracting data from cell phones. [116-3]. Ultimately, I need not resolve this issue. The evidence extracted from plaintiff's cell phone only matters if Nevarez lacked probable cause after Brown's first interview, and as discussed below, I conclude that Nevarez had probable cause to detain Brown.

unconstitutional entry, unlawful seizure, and unlawful detention. [60]. Defendants Mockler and Nevarez are the only remaining defendants. Count II is a Fourth Amendment claim against Mockler and Nevarez for the warrantless entry into Brown's home. [60] at 7; [133] at 4. Counts III and IV are overlapping Fourth Amendment claims against Mockler and Nevarez for the initial seizure of Brown. [60] at 8–9; [133] at 6. Count VI is a Fourth Amendment claim against Mockler and Nevarez for Brown's continued detention at the police station. [60] at 10; [133] at 10.

## IV. Analysis

### A. Unconstitutional Entry (Mockler)

Plaintiff acknowledges that defendant Nevarez was not present for his arrest nor ordered anyone to conduct a warrantless entry. [133] at 5 n.3. Thus, Nevarez is entitled to summary judgment with respect to Count II because he was not personally involved in the alleged constitutional violation.

#### *1. Supervisory Liability*

In addition to liability based on defendant Mockler's warrantless entry into the Throop Residence (discussed below), plaintiff also maintains that Mockler can be liable for Detective Bultema's undisputed warrantless entry into plaintiff's residence. [133] at 5–7. Claims under § 1983 are predicated on individual liability so respondeat superior does not apply. *See Ollison v. Gossett*, 136 F.4th 729, 735 (7th Cir. 2025). To prevail on a theory of supervisory liability, plaintiff must show that a supervisor, through his own conduct, violated his rights. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022).

Here, the parties dispute whether Mockler was a supervisor at the time of the arrest. According to defendants, Mockler was a detective with the Task Force in June 2023 and was not responsible for giving other task force members orders during investigations. [131] ¶ 4. However, as noted by plaintiff, several of the other detectives present at the arrest testified that Mockler *was* a supervisor at the scene. [131] ¶ 4. Defendants respond by noting that Mockler ultimately became the Assistant Commander of the Task Force in September 2024 (months before the depositions in the instant case occurred) which may have led to the deponents' confusion. [145] at 18. But for summary judgment purposes, there is a genuine dispute of material fact surrounding whether Mockler was Detective Bultema's supervisor when the latter's warrantless entry occurred.

That said, Mockler must be *personally* liable for Bultema's unlawful action. *See Ollison*, 139 F.4th at 735–36 (explaining that "the supervisory official must have known of, facilitated, approved, condoned, or turned a blind eye to his subordinates' activity"). Plaintiff has not pointed to any evidence suggesting that Mockler instructed Bultema to enter Brown's house, grab him, and effectuate the arrest. Mockler is entitled to summary judgment on plaintiff's supervisory liability theory.[3]

[3] I note, however, that there are audible statements in the body-cam footage in which someone is directing Bultema to grab Brown and thus seemingly approving and condoning his decision to effectuate a warrantless arrest inside of plaintiff's residence. [116-5] at 10:20–23. If defendant Mockler is the individual instructing the other officers to grab Brown, then there would be sufficient evidence to find that he was personally involved in Bultema's unlawful entry and seizure of plaintiff.

### 2. *Mockler's Unlawful Entry*

With respect to his own personal liability, defendant Mockler moves for summary judgment on the unconstitutional entry claim on the grounds that he never entered the Throop Residence. [117] at 13–14.

When video footage "firmly settles a factual issue," a court "will not indulge stories clearly contradicted by the footage." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007). But video footage can resolve a factual dispute only when the footage "is so definitive that there could be no reasonable disagreement about what the video depicts." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023). Video footage that is incomplete or open to different interpretations creates triable issues of fact. *See Horton*, 883 F.3d at 944.

Here, the body-cam footage does not clearly contradict Brown's narrative of the arrest. Though the video evidence of Mockler's entry is less clear than that of Detective Bultema, it nonetheless supports a reasonable inference that Mockler entered plaintiff's residence without a warrant. [116-5] at 10:20–26 (showing Mockler climbing the stairs and stepping on the door sill as Bultema removes plaintiff from the residence). Although defendants argue that the screenshots attached by plaintiff are susceptible to distortion, viewing the images with inferences in favor of Brown, Mockler appears to be across the threshold. Coupled with the body-cam footage that shows Mockler plant his feet on the threshold of the Throop Residence, a jury could find that Mockler crossed into the home.

### 3. *Exigent Circumstances*

Defendants argue that even if Mockler entered the Throop Residence, both his and Bultema's warrantless entries were justified by exigent circumstances. [117] at 15–19; [145] at 14–17.[4]

Defendants cite Illinois state law in support of their exigent-circumstances argument. [117] at 16–17. But the present case is in federal court, under federal-question jurisdiction, on issues of federal constitutional law. Illinois appellate interpretations of federal law are not controlling. In support of their position on applicable law, defendants quote *Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir. 2014), which states that "[f]ederal courts do not possess exclusive authority to decide Fourth Amendment issues." [145] at 17. This quote is taken out of context; the court in *Sutterfield* was explaining why state cases are relevant to the issue of qualified immunity, where state precedent may assist in evaluating the reasonableness of an officer's actions. 751 F.3d at 573. Indeed, in its analysis of the exigent-circumstances defense, the *Sutterfield* court cited exclusively to federal case law. *Id.* at 553–66.

[4] Plaintiff asserts that Mockler's opening brief focused exclusively on the exigent circumstances justifying Bultema's warrantless entry and that he has therefore waived the argument that exigent circumstances justified his own warrantless entry. [133] at 5 n.4. True, the section header in defendants' opening brief referred only to Bultema. [117] at 15. But I am satisfied that the argument applied to officers more broadly. For one, defendants concluded the argument by saying that exigent circumstances required "officers, including Bultema, to make quick decisions." [117] at 19. Further, defendants do not argue that Bultema's entry contributed to the exigency of Mockler's entry. The same arguments that apply to Bultema also apply to Mockler.

Warrantless searches and seizures within a home are presumptively unreasonable. *Russell v. Comstock*, 167 F.4th 984, 987 (7th Cir. 2026). This presumption may be overcome "where the exigencies create a compelling need to act and no time to secure a warrant, such as situations involving hot pursuit of a fleeing subject, the need to prevent the imminent destruction of evidence, or the need to protect an occupant from imminent injury or to render emergency aid." *Id.*; *see also Jackson v. City of Madison*, 176 F.4th 1005, 1019 (7th Cir. 2026) ("We ask 'whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape.'" (citation omitted)).

Defendants argue that the destruction-of-evidence theory applies to the present case. [117] at 16–17. Though the task force initially planned to conduct covert surveillance at the Throop Residence and arrest plaintiff only if it was possible to do so in a public space, the plan changed after the officers mistakenly arrested the wrong man. [131] ¶¶ 52–54. Combined with the fact that Wingard's handgun was still at large, defendants argue that the officers had an objectively reasonable belief that there was a compelling need to act and no time to obtain a warrant. [117] at 15–16 (citing *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006)).

But a mere possibility that evidence would be destroyed is not enough to create exigent circumstances. *United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010). The officer knocking at the door must also "observe[] objective evidence that there is an ongoing crime within that must be stopped before it is completed." *Id.* at 733–34.

Doors slamming or people running, for example, "may be evidence that there is an emergency that calls for an immediate, warrantless intrusion." *Id.* at 734. Here, by contrast, Brown was merely backing away from the door with his hands raised when Bultema proceeded to cross the threshold. [116-6] at 3:46–49. There was no objective evidence that Brown possessed evidence related to the homicide nor that he would have destroyed it but for the warrantless arrest.

This conclusion is bolstered by the fact that the officers left the Throop Residence following the arrest and did not seek permission to search the home for evidence that Brown may have sought to destroy. And the covert nature of the initial surveillance further suggests the lack of any emergency before officers knocked on the door. Nothing objectively alerted the officers to any imminent risks when Brown's family answered the door and declined to allow the entry, but otherwise complied with lawful instructions.

#### *4. Qualified Immunity*

"Qualified immunity shields police officers from liability for constitutional violations unless a plaintiff shows that (1) the official violated a constitutional right, and (2) the right was clearly established at the time of the challenged conduct." *Jackson*, 176 F.4th at 1021 (internal quotation marks omitted). With respect to the second prong, the right "must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotation marks and citations omitted).

It is undisputed that Bultema and Mockler (to the extent that he crossed the threshold into the Throop Residence) violated Brown's constitutional right to be free from a warrantless arrest inside the home. Instead, the parties disagree over whether it was clearly established that the officers' warrantless entry into the Throop Residence violated Brown's Fourth Amendment rights based on the information the officers possessed.

The burden is on plaintiff to prove that the law is clearly established. *Villalobos v. Picicco*, 168 F.4th 1057, 1062–63 (7th Cir. 2026). "A plaintiff carries this burden by pointing to specific cases, not general legal principles." *Id.* at 1063. Here, plaintiff cites several cases for the proposition that "the law is clearly established that non-exigent warrantless arrests inside the home violate the Fourth Amendment." [133] at 13 (citing *Gaddis v. DeMattei*, 30 F.4th 625, 633 (7th Cir. 2022)). But none of these cases "both articulate[] the right at issue and appl[y] it to a factual circumstance similar to the one at hand" where defendants have argued that exigent circumstances justified their arrest. *Villalobos*, 168 F.4th at 1063 (citation omitted); *see also District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (noting that the second prong of the qualified immunity analysis requires a high degree of specificity).

Plaintiff further cites cases for the proposition that "it was clearly established that police cannot claim a warrantless entry is justified to prevent the destruction of evidence unless they actually observed objective evidence that there is an ongoing crime that must be stopped." [133] at 13. This contention more closely fits this case. Though neither case cited by plaintiff addresses the viability of a qualified immunity

defense, the court in *Etchin* found that a warrantless entry violated the Fourth Amendment where the detective "did not see or hear anything to suggest that an emergency was taking place inside of [the arrestee's] apartment." 614 F.3d at 734. The court in *United States v. Collins*, 510 F.3d 697 (7th Cir. 2007), similarly found that a Fourth Amendment violation occurred when the police conducted a warrantless arrested within an individual's residence where they had not heard a crime.

Because defendants have not established that there was objective evidence of an ongoing crime occurring within Brown's residence, I find that Mockler is not entitled to qualified immunity as a matter of law with respect to Count II. Summary judgment on Count II, warrantless entry, is denied.

### B. Unlawful Seizure (Mockler)

#### *1. Probable Cause*

Defendant Mockler next moves for summary judgment on Count III—the unlawful seizure claim against him—on the grounds that probable cause existed at the time of arrest. An officer has probable cause to arrest an individual when "the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable person in believing that the arrestee had committed … a crime." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). The probable-cause standard is not a high bar and "inherently allows room for reasonable mistakes." *Id.*; *see also Kaley v. United States*, 571 U.S. 320, 338 (2014).

Probable cause is not offense-specific; probable cause to arrest for any offense is sufficient to overcome a wrongful arrest claim. *Thomas v. McAuliffe*, 170 F.4th 1057, 1063 (7th Cir. 2026); *see also Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (explaining that probable cause to arrest "is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution").

Defendants argue that Mockler had probable cause to arrest plaintiff for concealment of a homicide, concealing or aiding a fugitive, or obstruction of justice. [117] at 20–21; [110] at 6–8.[5] An individual is guilty of concealing a homicidal death when he "knowingly conceals the death of any other person with knowledge that such other person has died by homicidal means." 720 ILCS 5/9-3.4(a). In other words, the offense requires an individual to (1) know that a homicide has occurred and (2) have taken some affirmative act to conceal the homicide. *People v. Dibbern*, 2019 WL 4390641, at *3 (Ill. App. Ct. 2019).

Defendants argue that officers had probable cause to suspect Brown of concealing a homicide as a result of the circumstances surrounding the discovery of Lone's body (e.g., the body was behind a locked door, the television was on, a candle was lit, and a window was open). [110] at 7. Defendants argue—and I agree—that this is all evidence that a homicide was concealed.

[5] Defendants have incorporated by reference the probable cause arguments made in former-defendant Coleman's motion for summary judgment. [117] at 19–20.

But defendants have not established that Brown himself took any affirmative acts to conceal the homicide. Brown's presence inside the Woodlawn Residence and close association with Wingard the day following the homicide are not sufficient to demonstrate, as a matter of law, Brown's probable and knowing concealment of Lone's murder.

For one, a "person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause." *United States v. Carpenter*, 342 F.3d 812, 815 (7th Cir. 2003) (citation omitted). While propinquity is not irrelevant, there must be something more to connect Brown to an actual crime.

Defendants' "something more"—that Brown entered and exited the residence where Lone's body was decomposing and therefore knowingly participated in the concealment—is weakened by the same evidence that defendants use to show concealment in the first instance: a burning candle and open window lessened the likelihood that someone would be capable of smelling the dead body. [110] at 7. Lone's son apparently slept in the house the night of the homicide (given that he left the residence in his car the morning after she died) and was home for at least ten minutes the evening after she died without noticing anything was wrong. [131] ¶¶ 19, 34. It was ultimately a bullet hole, not the smell, that prompted Lone's son to search the house. [131] ¶ 36.

There is a dispute of material fact surrounding whether Brown would have known about a dead body inside the house as a result of spending time there the day

after Lone's homicide. The facts known to officers at the time of Brown's arrest did not support probable cause to arrest for concealment of a homicide.

Nor do the facts support probable cause for concealing or aiding a fugitive—an offense that required Brown to conceal his knowledge that an offense had been committed or have the specific intent to prevent the apprehension of an offender. 720 ILCS 5/31-5(a), (b). Defendants have not established that (at the time of arrest) Mockler reasonably believed Brown knew that Wingard had committed a crime and was trying to conceal his whereabouts.

Finally, an individual "obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person," he knowingly "[d]estroys, alters, conceals or disguises physical evidence, plants false evidence, [or] furnishes false information." 720 ILCS 5/31-4 (a)(1). Defendants' probable-cause argument for obstruction of justice is similarly grounded in their assertion that the evidence shows Brown knowingly participated in the concealment of the discovery of Lone's death. [117] at 21. For the same reasons discussed above, the officers did not have probable cause to arrest plaintiff for obstructing justice.

At the time of plaintiff's arrest, the task force did not possess facts suggesting that Brown knew there had been a homicide or knew that Wingard had committed a crime. Probable cause to arrest was lacking.

### 2. *Qualified Immunity*

Defendant Mockler argues that he is entitled to qualified immunity on the unlawful seizure claim because, even if probable cause was lacking, a reasonable

officer could have believed there was probable cause to arrest Brown. [117] at 20. Brown has shown a violation of his constitutional right to be free from arrest without probable cause. In the unlawful seizure context, the second prong of the qualified immunity test can be framed as "whether a reasonable officer could have mistakenly believed that probable cause existed." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013) (citation omitted). This concept is often called "arguable probable cause;" officers "who reasonably but mistakenly believed they had probable cause to arrest" are entitled to qualified immunity. *Id.*

Plaintiff asserts that no reasonable police officer could have understood that there was probable cause to arrest Brown and detain him for questioning. [133] at 14–15. Specifically, plaintiff cites *Kaupp v. Texas*, 538 U.S. 626 (2003), for the proposition that it was a Fourth Amendment violation for officers to handcuff and interrogate an individual, "even when there was no doubt a murder had occurred, one person confessed, and they purportedly implicated the defendant." [133] at 14.[6] While plaintiff's cited case need not be perfectly analogous to the case at hand, "the bar is still high: plaintiff[] must point to precedent placing the statutory or constitutional question beyond debate." *Villalobos,* 168 F.4th at 1063 (internal quotation marks and citations omitted).

[6] Plaintiff also cites a line of cases holding that there is no probable cause to arrest when it is unclear whether a crime has occurred. [133] at 14. But the circumstances in the cited cases are not sufficiently analogous to those in the present to establish that the officers were unreasonable in their belief that they had probable cause to arrest Brown in connection with the homicide.

This case is not sufficiently analogous to *Kaupp*. In *Kaupp*, the defendant had voluntarily taken and passed a polygraph test denying his involvement in the murder. 538 U.S. at 628. More importantly, the detective had "tried but failed to obtain a warrant to question [the defendant]." *Id.* In other words, the detectives had an unmistakable reason to believe that they lacked probable cause to arrest. Any mistaken belief the detectives in *Kaupp* had regarding probable cause to arrest was not reasonable.

Here, by contrast, the task force had not previously attempted to obtain an arrest warrant. While the parties dispute whether the task force *should* have first sought an arrest warrant, *see* [131] ¶ 47, the dispute does not detract from the fact that the officers had not been informed that they lacked probable cause. To the contrary, when waiting to speak with Brown outside of the Throop Residence, the task force can be heard articulating their understanding that they had probable cause for plaintiff's arrest. [116-4] at 1:00–07. Regardless of whether they were mistaken, the audio belies the possibility that the officers knew that they did *not* have probable cause to arrest. Further, when the officers sought a search warrant for Brown's phone, they relied upon the same evidence detailed above and a judge determined that there *was* probable cause to believe the device possessed evidence of murder. *See* [116-16].

The facts in the three district court cases cited by plaintiff are more dissimilar to the case at bar than those in *Kaupp*. These cases do not establish that a reasonable

officer could not have mistakenly believed that there was probable cause to arrest Brown for knowingly concealing a homicide, aiding a fugitive, or obstructing justice.

At the time of plaintiff's arrest, the task force knew there was a dead body, plaintiff had been inside the residence where the body was being concealed, plaintiff was a close associate of the primary suspect, and plaintiff had been in at least one of the victim's vehicles after her death. Because plaintiff has not directed me to clear precedent to the contrary, I find that this is sufficient to establish arguable probable cause of all three of the proposed offenses. Defendant Mockler is entitled to qualified immunity on the unlawful seizure claim and summary judgment is granted on Count III. The rush to grab plaintiff was a mistake, but not one by a plainly incompetent officer. *See City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021) (qualified immunity protects all but the plainly incompetent or those who knowingly violate the law).

**C. Unlawful Seizure and Detention (Nevarez)**

Plaintiff concedes that defendant Mockler did not order plaintiff's transport to a police station and that Mockler was not responsible for the subsequent detention. Therefore, Counts IV and VI pertain only to defendant Nevarez. [133] at 10 n.6. Nevarez moves for summary judgment on these remaining counts on the grounds that probable cause defeats the unlawful seizure claim (Count IV) and the reasonableness of Brown's detention defeats the unlawful detention claim (Count VI).

The decision to transport an individual to be questioned must be supported by probable cause. *See Hayes v. Florida*, 470 U.S. 811, 815–16 (1985). With the

knowledge of the task force members imputed to Nevarez, *see United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (describing collective knowledge doctrine), Nevarez, like Mockler, had arguable probable cause to seize plaintiff.

Summary judgment is granted on Count IV.

Finally, even if the officers had only arguable probable cause at the time of Brown's arrest, defendant Nevarez had probable cause to continue detaining Brown following his first interview.[7] Before the arrest, the task force had seen video footage confirming that plaintiff had entered the Woodlawn Residence the day after Lone was killed (while her body was still inside). [131] ¶ 21. Yet during his first interview, Brown told the detectives that he did not enter the Woodlawn Residence that day and only went into the garage to get the Buick. [111-12] at 47:28–49:03.

Knowingly furnishing false information constitutes obstruction of justice. 720 ILCS 5/31-4 (a)(1). It was reasonable for Nevarez to deduce from Brown's lie that Brown was involved in (or at least had knowledge pertaining to) Lone's murder.[8]

Plaintiff's unlawful detention argument focuses exclusively on the issue of probable cause; he does not argue that the ultimate length of his detention was

---

[7] The parties dispute whether Nevarez decided that plaintiff would not be immediately released after his first interview or his second interview. [131] ¶ 74; [141] ¶ 13. But since sufficient probable cause existed after the first interview, any additional probable cause obtained after the second interview is immaterial.

[8] Plaintiff faults Nevarez for being unable to articulate his basis for continuing to detain plaintiff during his deposition. [133] at 10–11. "A party cannot claim a lack of general knowledge about a subject and later make a statement which requires detailed knowledge about the same subject." *Unterreiner v. Volkswagen of Am.*, 8 F.3d 1206, 1210 (7th Cir. 1993). But the order of operations here is reversed. Nevarez's deposition was taken over two years after Brown's arrest in this case. The fact that he could not remember whether plaintiff implicated himself in a crime during the first interview does not mean Nevarez lacked probable cause to continue detaining Brown in June 2023.

unreasonable. And nor could he. Where probable cause exists within 48 hours of arrest, the burden is on the arrested individual to prove unreasonable delay. *Riverside Cnty. v. McLaughlin*, 500 U.S. 44, 56–57 (1991). Arguable probable cause existed at the time of plaintiff's arrest, developed into probable cause as a matter of law after he was detained and made a materially false statement to the police, and he was released within 48 hours. Summary judgment is granted on Count VI.

## V. Conclusion

Defendants' motion for summary judgment, [115], is granted in part, denied in part. Summary judgment is granted to defendants on all claims except for the unconstitutional-entry claim against defendant Mockler.

ENTER:

Manish S. Shah
United States District Judge

Date: August 11, 2026